## Marich's Estate.

*Husband and wife — Marriage — Common law marriage — Intention — Cohabitation—Reputation—Evidence.*

1. Where a man and woman intend to marry and so contract, and the contract is consummated and ratified thereafter by continuous living together, by reputation and by other surrounding circumstances, a valid common law marriage exists.

2. Where one of the parties so contracting is under a disability, such as a prior marriage, their cohabitation, matrimonially intended, will, as a matter of law, make them husband and wife from the moment the disability is removed.

3. The fact that the woman is under age does not affect the validity of the common law marriage.

4. A common law marriage contracted in another state will be recognized as valid in Pennsylvania, if the parties subsequently move to this State and one of them dies here.

Exceptions to auditor's report. O. C. Blair Co., 1926, No. 518½.

*A. H. McCamant*, for exceptant; *Hicks* and *Owens*, contra.

BALDRIGE, P. J., Oct. 18, 1926.—On March 7, 1925, the decedent, a laborer for the Pennsylvania Railroad, was killed. He was buried under the name of

## Marich's Estate.

Eli Marich, an assumed name, and also his real name, Milan Drobnjak. Letters of administration were issued, an account filed showing a balance for distribution of $7536.47. This balance is claimed by Mary Marich and Annie Marich as widow and daughter, respectively, of the decedent, and by George Drobnjak, father of decedent, as surviving parent, the father contending that the decedent was not married and had no legitimate child at the time of his death.

This widow, whose maiden name was Mary Capan, in January, 1923, when she was sixteen years of age, left her father's home at Harrisburg in company with Stoyan Marikovic, and went to Hagerstown, Maryland, where they were married Feb. 3, 1923. Two days thereafter she returned to her father's house and alleged she was forced by threats to marry, and thereupon action to annul the marriage was instituted. On July 1, 1923, a hearing was held, and a final decree annulling this marriage was entered on Nov. 27, 1923.

On July 15, 1923, Mary left her father's home at Harrisburg and went to live with the decedent, Eli Marich, as his wife. It was testified by Mary that she was told by her father that she had been divorced from her first husband, and that she thought she was free to marry Eli Marich after the hearing on July 1st. It appears that there was no illicit relationship existing between the decedent and this widow prior to the time they went to live together, on which day the decedent agreed to take her as his wife, and, as she testifies, "he told me that I was his wife." They continued uninterruptedly from that time until the death of the decedent to live together as man and wife. The auditor, after hearing testimony, found as a fact that there was never a marriage ceremony had by any church or civil authority, but that there was a valid common law marriage and that the daughter was a legitimate child. Exceptions were filed to these conclusions.

The exceptant maintains (a) that if there ever was an attempted common law marriage, it was in Phœnix, Maryland, where it is alleged the father of Mary lived on July 15, 1923, and that the State of Maryland does not recognize common law marriages; (b) that Mary was not capable at that time of entering into a marriage contract, as she was not of lawful age to enter contractual relations; (c) that there was no valid common law marriage.

It is not entirely clear just where the marriage agreement took place, but immediately thereafter the contracting parties traveled in Pennsylvania to Mary's sister, who lived in Pittsburgh, and they continued to remain in this State until the death of the husband. On July 15, 1923, Mary had not obtained her divorce and was, therefore, unable to enter into a legal marriage at that time. But, under the auditor's findings, the widow was of the opinion that she was free to marry. Notwithstanding the bar that then existed, it was the intention of the parties to marry, and the contract was consummated and ratified thereafter by continuous living together, and by the reputation and the other surrounding circumstances a valid marriage existed. Judge Ashman, in a very well-considered opinion in Bergdoll's Estate, 7 Dist. R. 137, in discussing the question of the quality of proof to establish a common law marriage which may have been legally illicit at the commencement, says "the question of intent lies at the basis of the matter. If the parties, by their union, intend to create an honest marriage, the law will respect and enforce their purpose. This proposition is universal; the difficulty in its application is that different standards of proof have been adopted by which the intent is ascertained. It is said by a text-writer that, 'if the parties desire marriage and do what they can to render their union matrimonial, but one of them is under a disability, as where there is a prior marriage undissolved, their

cohabitation thus matrimonially meant will, in matter of law, make them husband and wife from the moment when the disability is removed; it is immaterial whether they know of its existence or removal, nor is this a question of evidence: 1 Bish. on M. D. & Sep., § 970. . . . The living together of marriageable parties a single day as married, they meaning marriage and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony.' " Whether these parties agreed to become man and wife in Maryland or Pennsylvania is, therefore, not vital to this proceeding.

Respecting the minority of Mary, the fact that she was under twenty-one years of age does not affect the validity of her contract, as, under the common law, infants were permitted to marry at the age of consent, which in the case of males was fixed at the age of fourteen and females at the age of twelve: 26 Cyc., 842. If the parties are under age, either may disaffirm and avoid the marriage upon their arrival at the age of consent. The marriage is not invalid, but persons who solemnize such marriages may be punished.

This brings us to the inquiry as to whether there was a valid common law marriage. The decedent introduced and referred to Mary as his wife to the relatives and to all their friends. He designated her as such in letters which he wrote to her; in his application for membership in the Provident Loan Association; in his request for a pass; in his membership in the Pennsylvania Railroad Relief Association. When a child was born to Mary, he told the attending physician that he was its father and that the child was legitimate. The child was baptized by the priest of the Russian Orthodox Greek Church and a baptismal certificate duly issued. The attending priest testified that the decedent stated that his wife was the mother of the child, and when asked if they were married by the church, he replied in the negative and stated that they were "living by license," which the priest stated meant a civil marriage. All these circumstances point convincingly to the fact that the decedent regarded this claimant as his wife, and the auditor so found.

In this State, reputation, cohabitation, the declarations and the conduct of the parties are sufficient to establish a common law marriage: Richard v. Brehm, 73 Pa. 140; Strauss's Estate, Bonowitz's Appeal, 168 Pa. 561; Craig's Estate, 273 Pa. 530.

It is contended by the exceptant that, if cohabitation has been meretricious in its inception, its illicit character is presumed to continue. We concede to that principle, but it is inapplicable in this case. In Com. v. McDermott, 75 Pa. Superior Ct. 408, cited by the exceptant, the relation was illicit in its inception and known to be so by the parties, and there was no adequate proof to show any change in the conditions. In the case at bar the auditor found that the parties intended to marry and believed that they were entering into a legal contract. The admissions, the acknowledgments, conduct and reputation of the parties show that they believed themselves to be man and wife and intended to be known as such. As both recognized their action as a marriage contract, there was no necessity for a repetition or renewal thereof, as they were unaware that their matrimonial undertaking was invalid. The decedent evidently never knew of any legal obstacle to his taking Mary to be his wife. They, in good faith, lived together as husband and wife after there was a complete removal of the only obstacle in the way of a valid marriage, and proclaimed themselves to the public as husband and wife until the former's death.

Judge Penrose, in Thewlis's Estate, 217 Pa. 307, says: "Naturally, there was no repetition of a marriage ceremony, or any formal expression of mar-

riage contract, for the wife never had knowledge that the one already entered into was not valid; but each day during these many years that they thus lived together was an assertion by acts and conduct which, in law, are as efficacious as words for establishing a contract by implication, . . . where in good faith the parties continue to live together as husband and wife, after the complete removal of the only obstacle in the way of a valid marriage, and so for many years continuously proclaim themselves to the public until the relation ceases by the husband's death. The presumption of continuance of an illicit relation, under such circumstances, gives away to the superior presumption in favor of compliance with the requirements of the law, of morality and of common decency."

In the case of Knecht v. Knecht, 261 Pa. 410, 417, Justice Frazer, after analyzing and reviewing a number of cases, including most, if not all, cases cited by the exceptant, says: "The doctrine of those cases is not to be extended to one like the present, where in good faith the parties continue to live together as husband and wife, after the complete removal of the only obstacle in the way of a valid marriage, and so for many years continuously proclaim themselves to the public until the relation ceases by the husband's death."

Chief Justice Mercur, in the Appeal of Reading Fire Insurance and Trust Co., Guardian, 113 Pa. 204, states expressly that he does not desire to disturb the law as declared in Richard v. Brehm, 73 Pa. 140, wherein is defined the kind of evidence that is necessary to be held satisfactory to prove marriage, and holding that marriage may be proved in civil cases by reputation, declarations and conduct of the parties, and other circumstances usually accompanying those relations.

We think it is unnecessary to further elaborate on the exceptions filed. The learned auditor was justified in his finding of fact, and his conclusions of law are entirely warranted, and we concur in his comprehensive and convincing report.

Exceptions are, therefore, overruled.

From Robert W. Smith, Hollidaysburg, Pa.